FILED

JUL 3 0 2024

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

RARE BREED TRIGGERS, LLC, et al.,     )
**Plaintiffs,**     )
v.     )     **Case No. 22-CV-107-GKF-JFJ**
**THOMAS ALLEN GRAVES, et al.,**     )
**Defendants.**     )

**Rule 60 Motion to Vacate Default Judgment**

Thomas Graves, Defendant, moves this Court to vacate its default judgment against him, pursuant to Rule 60(b) which reads, in relevant part, "a final judgment, order, or proceeding may be vacated due to: (4) the judgment is void; or (5) the judgment has been satisfied, released, or discharged." Unlike a Rule 60(b)(1)–(3) motion, there is no one year time bar at issue here.[1]

Rare Breed Triggers, LLC and ABC IP, LLC ("Plaintiffs") filed suit against Thomas Allen Graves[2] and served him. As Mr. Graves failed to answer the Complaint or appear, pursuant to Rule 5(a)(2), Plaintiffs did not serve Mr. Graves with any other paper filed in this Court for approximately 2 years. On June 15, 2022, Plaintiffs filed a First Amended Complaint, but failed to serve Mr. Graves. Dkt. 36. Consequently, the Court denied the Plaintiffs' Motion for Default. Plaintiffs again moved for default judgment based upon the original complaint which the Court

---

[1] "Despite the language of Rule 60(b) that all motions for relief must be 'made within a reasonable time,' a motion under Rule 60(b)(4) may be made at any time." *U.S. v. Buck*, 281 F.3d 1336, 1344 (10th Cir. 2002). This is because a judgment that is void is a nullity from the outset. *Calcari v. Ortiz*, Civil Action No. 04-cv-01298-ZLW, at *4 (D. Colo. Feb. 8, 2012). A Rule 60(b)(5) motion must be brought within a "reasonable time," but is not subject to the one-year bar. *Id.*

[2] Plaintiffs filed suit against a number of additional Defendants which are not the subject of this motion. This would include Powered By Graves, Inc. ("PBG"). Mr. Graves does not have, nor has he ever had control or any ownership of the company.

1

granted. Dkt. 57. However, Plaintiff effectively side-stepped the due process requirement of serving an amended complaint on Mr. Graves by providing declaration and allegations in its Motion for Default which were not set forth in the original complaint. As a default judgment may only be based upon the factual allegations of a well-pleaded complaint, the default judgment is void. While Rule 55(b) allows the Court to hold a hearing to conduct an accounting and "establish the truth of any allegation by evidence," the allegation must be present in the complaint. Otherwise, a plaintiff could, as here, effectively amend its complaint through its motion for default without ever serving the defendant. Additionally, the First Amended Complaint was served upon three Defendants and became the operative pleading, thus, superseding the original complaint. Consequently, a default judgment could not be based upon a legally ineffective complaint. For these two independent reasons, the Default Judgment is void under Rule 60(b)(4).

Moreover, Plaintiffs have already received payment for the very triggers in question in whole or in part, and thus, the judgment has been at least partially satisfied. Rule 60(b)(5) is not subject the one year time bar of Rule 60(c)(1). As Mr. Graves only recently learned of that the settlement in a prior case covered the triggers at issue in this case, this motion is brought within a reasonable time.

## I.    Background

One must wonder about Plaintiffs' motivation for expending resources on Mr. Graves who lives a pauper's existence. Especially, when they've already had their recovery, at least in part, from other parties. He currently lives on the Osage Indian reservation occupying a house powered by a generator which is without running water. Despite his lack of formal education, Mr. Graves has a gifted mind for all things mechanical. He is a prolific inventor and has obtained several patents. The Plaintiffs in this case, approached Mr. Graves to obtain a license to his patents and to hire him as a technical expert. Mr. Graves declined.

2

Instead, Mr. Graves entered into a patent licensing agreement with Big Daddy Unlimited ("BDU"). Subsequent to Mr. Graves license with BDU, Plaintiffs continued their attempts to entice Mr. Graves away to no avail. A company affiliated with BDU's owner, Blackstock (owner of Powered By Graves), contracted with Janeway to have trigger manufactured which BDU sold. Mr. Graves role in all of this was to license his technology to BDU and promote the product. As discussed below in more detail, Plaintiffs filed suit against BDU and Blackstock in Florida. Plaintiffs later brought this suit against Mr. Graves and Janeway[3]. While the license between Mr. Graves and BDU included a duty to indemnify Mr. Graves, BDU was financially unable to do so.

The accusations in this against Mr. Graves are that he promoted the product on videos "encouraging" customers to buy the Alamo-15 triggers. Dkt. 2 ¶¶ 60–63, 65. Plaintiffs claim this constitutes infringement by Mr. Graves. *Id.* ¶ 64. However, Plaintiffs' evidence points to websites and videos by Powered By Graves, Inc. and BDU. *Id.* ¶¶ 61–63, 65. In fact, the only evidence pertaining to Mr. Graves is that he allowed the use of his likeness in a marketing campaign. Even assuming all of the marketing activity contained in *id.* ¶¶ 60–63, 65 were attributable to Mr. Graves, it would be woefully insufficient under the law to constitute infringement. A patent may be infringed by making, using, selling, offering to sell, and/or importing an infringing item. An offer to sell a product must arise to the specificity required under contract law. If mere marketing were enough, any actor that allows their name and likeness be used in conjunction with selling an infringing product would be liable for patent infringement. Such is not the law.

---

[3] As Defendant is not privy to the corporate structure of Janeway, Valor, and 7050, it is using "Janeway" to generally describe those companies which are believed to share common ownership. Upon information and belief, BDU contracted with Janeway for the manufacture of the ALAMO-15 triggers. The extent to which Janeway used another company to fulfill its contract is unknown, but appears to have been done by 7050 Corp.

Plaintiffs also allege "on information and belief," that Mr. Graves "holds a principal

interest in the manufacture, sale, and/or offer for sale of the [Alamo-15] triggers" (Dkt. 2 ¶ 66)

which was watered down in the First Amended Complaint to "holds at least some control over the

product being made, offered for sale, or sold" (Dkt 36 ¶ 73). Neither of these alleged facts are true,

however, even if taken as true they do not constitute patent infringement, lest every shareholder of

a company held to infringe a patent would themselves by an infringer. From its inception, this case

has been a sham litigation against Mr. Graves and an abuse of judicial process. Plaintiffs knowing

that Mr. Graves does not have the resources to litigate are attempting to steamroll him and take his

intellectual property.

## II.   Argument

### A.   Judgement is Void---Rule 60(b)(4)

#### 1.   The original complaint was superseded by the First Amended Complaint and could not serve as the basis for a default judgement

On March 8, 2022, Plaintiffs filed suit against Thomas Allen Graves[4] and served him.

Dkt. 2. As Mr. Graves failed to answer the Complaint or appear, pursuant to Rule 5(a)(2),

Plaintiffs did not serve Mr. Graves with any other paper filed in this Court from March 9, 2022, to

February 16, 2024 (or approximately 2 years).

On June 15, 2022, Plaintiffs filed a First Amended Complaint which added an additional

five Defendants. Dkt. 36. Additional allegations were added which allegedly pertain to

Mr. Graves. For example, Plaintiffs add Exhibit D evidencing that Blackstock, Inc. owns and

controls Powered By Graves ("PBG"). *Id.* ¶ 75. The amended complaint also adds several

paragraphs which are mostly directed to the five new Defendants, but also include allegations

---

[4] Plaintiffs filed suit against a number of additional Defendants which are not the subject of this motion. This would include Powered By Graves, Inc. ("PBG"). Mr. Graves does not have, nor has he ever had control or any ownership of the company.

aimed at Mr. Graves and/or PBG. *Id.* ¶¶ 77–87. For example, PBG posts (¶ 78), and photos alleged to evidence PBG and Mr. Graves "promoted the sale of the Infringing Device" (¶ 79). "District courts have found that changes to a pleading constitute a 'new claim for relief' [under Rule 5(a)(2)] when a new party is joined, the demand for judgment is altered, the amount of damages sought is increased, new facts are incorporated, or the party seeks new declarations and injunctions." *Bodied by Bella Boutique LLC v. Bodyed by Bella LLC*, 2:21-cv-00693, at \*8 (D. Utah Jan. 23, 2023); *Warming Trends, LLC v. Flame Designz, LLC,* 22-cv-00252, at \*10 (D. Colo. Aug. 25, 2023) (The amended complaint contains "substantive factual changes" and therefore must be served). Thus, Plaintiffs should have served Mr. Graves with the amended complaint, as required by Rule 5(a)(2).

For that reason, this Court denied Plaintiffs Motion for Default Judgment against Mr. Graves. Dkt. 53. The Court correctly noted that Plaintiffs had failed to serve Mr. Graves with the First Amended Complaint and had also failed to move the Court Clerk to file an entry of Default with respect to the First Amended Complaint. *Id.* at 1–2. The Court noted that due process required Mr. Graves be served. *Id.* at 2. The Court also properly rejected Plaintiffs request to enter relief based upon proposed factual findings, noting that default judgment "may [only] lawfully be granted on the well-pleaded facts alleged" in the Complaint. *Id.* The Court dismissed the motion without prejudice and provided that Plaintiffs could either serve Mr. Graves with the amended complaint or proceed on the original complaint. However, Plaintiffs did not have the option to proceed under the original complaint, as an amended complaint supersedes the original complaint rendering it of no legal effect.[5] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991);

---

[5] Here, the First Amended Complaint does not adopt or incorporate the original complaint. *See* Dkt. 11.

*King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *NOCO Co. v. OJ Commerce, LLC*, 35 F.4th 475, 480 (6th Cir. 2022) ("The amended complaint, of course, supersedes the original complaint."). As such, "the original pleading is [considered] abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." *Pintando v. Miami–Dade Housing Agency*, 501 F.3d 1241, 1243 (11th Cir.2007) (*per curiam*). In addition, the First Amended Complaint was properly served under Rule 5 (electronically) on three of the original Defendants (PBG, Valor Manufacturing, and Valor Arms) and formed the basis for this Court's consent judgment which included judgement against the newly added Defendants. Dkt. 45. Thus, the amended complaint is believed to be the operative complaint for this case, and the default judgment is void under Rule 60(b)(4).

## 2. Default judgment is not supported by the well-pleaded facts of the complaint

In Plaintiffs' Second Motion for Default Judgement, as in the first, they rely heavily upon the declarations of Mr. Bellamy, Mr. DeMonico, and Mr. Leleux. Dkt. 54-4–54-6. While the Motion plays lip-service to the legal standard that this Court must determine "whether the plaintiff's complaint continues sufficient factual matter, accepted as true, to state a claim for relief," in reality, Plaintiffs relies solely on its declarations for support. Dkt. 54 at 5. In the context of a default judgment, the Court accepts the well-pleaded factual allegations of the complaint as true, however, it does not accept facts that are not well-pleaded, conclusions of law, or facts relating to the amount of damages. *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007). Plaintiffs had no choice but to rely upon declarations setting out new factual allegations because the complaint utterly fails to set forth any basis for finding patent infringement. These inadequacies will be addressed below.

While Rule 55 (b) allows the Court to conduct a hearing to determine the quantity of damages and "establish the truth of any allegation by evidence," this does not override the requirement that default judgment must be based on a well-pleaded complaint. *Wooten v. McDonald Transit Assocs., Inc.*, 775 F.3d 689, 699 (5th Cir. 2015) ("Despite this expansive language, neither this circuit nor any other has squarely held that such a hearing would be appropriate to adduce facts necessary to state a claim that were absent from the pleading on which judgment was sought."). Otherwise, a plaintiff could avoid serving an amended compliant be providing evidence at the hearing and subvert due process of law. *Id.* ("[O]ur precedents and those of our sister circuits, and the policies underlying our default-judgment jurisprudence … hold that a defective complaint cannot be redeemed by evidence presented at a prove-up hearing and therefore cannot support a default judgment absent amendment of the pleadings."). The Court held to "establish the truth of any allegation," there must be an existing allegation to assess, and a court's authority to "investigate any other matter" in a default-judgment hearing is circumscribed by the stated purpose of the hearing–"to enter or effectuate judgment." *Id.* As there can be no judgment absent competent pleadings, "it strains the text of the rule to suppose that this investigatory power encompasses the adduction of facts necessary to render the pleadings competent in the first place." *Id.* Thus, Plaintiffs' declarations may not supply the factual allegations missing from the Complaint.

The accusations set out in the Complaint against Mr. Graves attempt to leave the impression that by promoting the sale of an allegedly infringing product, Mr. Graves becomes himself an infringer. Dkt. 2 ¶¶ 59–65 (these six paragraphs constitute the entirety of Plaintiffs' allegation against Mr. Graves). However, marketing and product promotion of infringing products does not violate patent law. 35 U.S.C.§ 285 reads: "whoever without authority makes, uses, offers

to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Defendants accused of patent infringement have attempted to garner insurance coverage based on their advertising and marketing activities, but these attempts have been rejected as marketing and advertising do not constitute patent infringement. *Novell, Inc. v. Federal Insurance Company*, 141 F.3d 983, 989 (10th Cir. 1998); *Intex Plastics Sales Co. v. United Nat. Ins. Co.*, 23 F.3d 254, 256 (9th Cir. 1994) ("[A] claim of patent infringement does not 'occur in the course of . . . advertising activities' … even though the insured advertises the infringing product."). While "an offer to sell" may constitute patent infringement, "an 'offer to sell' is to be interpreted according to its ordinary meaning under contract law. *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000). As such, it requires something much more specific than a mere advertisement; namely, "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.*, 215 F.3d at 1257. None of Mr. Graves' conduct alleged in the Complaint rises to this level. Rather, the alleged conduct squarely falls within the permissible rubric of product promotion.

Paragraph 59 reads: "Graves holds a principal interest in the manufacture, sale, and/or offer for sale of the Infringing Device." Stating that someone "holds a principal interest" in making, selling, or offering to sell a product is nonsensical. If the statement is intended to mean that Mr. Graves holds a principal interest in a company engage in those activities, it is untrue and, for our purposes, irrelevant. Holding an interest in a company that is engaged in infringing activity does not constitute patent infringement, lest shareholders of an infringing corporation would themselves be infringers.

8

Paragraph 60 alleges Graves is "involved in the promotion and sale" of infringing triggers. However, it makes clear that "involved in" simply means "encouraging customers to buy." Likewise, the use of Mr. Graves name and image in promotional videos falls into the same non-infringing, promotional category. Dkt. 2 ¶¶ 61–63. Again, the allegations, if taken as true, do not constitute infringing activity, lest Geroge Clooney be liable if Nespresso is found to infringe upon another competitor's patent. Paragraph 65 attempts to equate the use of Mr. Graves' name and likeness to conclude he must therefore hold "at least some control over the product" being made and sold which again, even if taken as true does not constitute patent infringement. Paragraph 64 is a legal conclusion, albeit a mistaken one, and entitled to no weight.

Plaintiffs point to websites and videos by *Powered By Graves, Inc. and BDU*. In fact, the only evidence pertaining to Mr. Graves is that he allowed the use of his likeness in a marketing campaign. Even assuming all of the marketing activity contained in *id.* ¶¶ 60–63, 65 were attributable to Mr. Graves, it would be woefully insufficient under the law to constitute infringement. A patent may only be infringed by making, using, selling, offering to sell, and/or importing an infringing item. The alleged activities do not constitute any of those forbidden activities. Thus, all facts plead in the Complaint, taken as true, do not come close to supporting a default judgment of patent infringement.

The Complaint also contains generalized statements pertaining to "Defendants" or "Defendant" without specifying which Defendant(s) are being discussed. For example, "Defendants' making, using, selling, offering for sale, and/or importing of the Infringing Devices is a direct and/or indirect infringement of the '223 Patent under 35 U.S.C. § 271 (a), (b), and/or (c)." Dkt. 2 ¶ 74. *see also*, ¶ 13 ("Defendants have committed acts of patent infringement."), ¶¶ 49 & 50 ("Defendant is currently making, using, selling, and/or offering for sale [the ALAMO-15

trigger] which embodies the technology claimed in the '223 Patent."). In the context of the Complaint, it seems improbable that these statements were intended to apply equally to each individual Defendant. This is especially true, given the identical statements were made after the addition of five more Defendants. Dkt. 36 ¶¶ 89, 21, 57, 58. It is difficult to believe that Plaintiffs are alleging 8 different companies and Mr. Graves are each manufacturing the ALAMO-15 trigger and each responsible for selling it. As the Plaintiffs made the same claims in Florida against Big Daddy Unlimited, Big Daddy Enterprises, and Blackstock, Inc. ("the Florida Defendants"), it is clear that the statements in all three complaints are merely reciting the elements of the underlying statute and make use of "Defendant(s)" in a sweeping manner, not intend to refer to each specific Defendant. Ex. A ¶¶ 63, 12, 47, 48. As the Plaintiffs are well aware from their Florida litigation, the Florida Defendants contracted with Janeway to have the Alamo-15 triggers manufactured and the Florida Defendants were responsible for selling them. Plainitiffs' knowledge is reflected in the Complaint ¶¶ 59–65 which are specific to Mr. Graves and limit the factual allegations to promoting the trigger, even though it makes the erroneous legal conclusion that such activities constitute an offer to sell. Dkt. 2. The First Amended Complaint adds alleged facts which state that PBG is responsible for the sales of the triggers and Blackstock (one of the Florida Defendants) owns PBG. Dkt. 36 ¶¶ 74–76. Moreover, the Court entered an Amended Consent Judgement of $1,308,600 against 7050 Corp. (which is trebled) based upon representations by the other Parties in this litigation that 7050 Corp. made and sold 4,362 triggers.[6] Dkt. 45 ¶ 12. Therefore, read in the context of the Complaint, these generalized statements pertaining to "Defendant(s)" did not put Mr. Graves on notice that they were intended as allegation of his conduct.

---

[6] To state the obvious, if 7050 Corp. made and sold the triggers to BDU who sold them retail, Mr. Graves could not have made and sold the same triggers.

Moreover, all of the generalized "Defendant(s)" statements merely parrot the language of the patent statute and do not form a part of well-pleaded facts to be relied upon in a default judgment. *DirecTV, Inc. v. Hoa Huynh*,503 F.3d 847, 854 (9th Cir.2007) (merely parroting the language of the statute creating liability is insufficient). While made in the context of Rule 12(b)(6), the Supreme Court has held that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*,556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*citing Bell Atl. Corp. v. Twombly*,550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Logic dictates that if such statements are incapable of stating a claim under Rule 12(b)(6), they are insufficient of supporting a default judgment.

Likewise, Plaintiffs allege no facts to support its claim that Mr. Graves is joint and severally liable for the infringing acts of PBG or Valor. The entirety of Plaintiffs' argument is that patent infringers are jointly and severally liable, and therefore, are fully liable for all damages assessed against Valor. Dkt. 54 at 9. In order for Mr. Graves to be jointly and severally liable for all 4,362 triggers allegedly sold, there would need to be at least an allegation he that he was involved in the sale or manufacturing of the triggers, or in control of Valor. No such allegation is made. Mr. Graves was not an agent or employee of Valor nor does the Complaint allege otherwise.

Realizing the facts plead in the Complaint are insufficient to support a default judgment, Plaintiffs "supplemented" their allegations in their Second Motion for Default Judgment and attempted to support a portion of them via declarations. Dkt. 54. Throughout their Motion, Plaintiffs group Mr. Graves with PBG, as the present motion is limited to Mr. Graves, only the relevant allegations are addressed. For example, Plaintiffs contend, for the first time, that Mr. Graves is "affiliated" with Valor and "participated directly" in the manufacture and sale of the

Alamo triggers. *Id.* ¶¶ 5, 14 (*citing* Dkt. 2 ¶¶ 59–77). The citation to the Complaint does not support the new allegation, while paragraph 68 does allege Valor makes and sells the triggers, there is no allegation that Mr. Graves is "affiliated" with Valor or that he participated directly in making and selling triggers. For support of this new allegation, one must turn to Mr. Bellamy's declaration. Dkt. 54-5 ¶¶ 18, 20. Not only does Mr. Bellamy's declaration lack any evidentiary basis, for example, he does not claim nor could he possess first-hand knowledge of the alleged facts, in circular fashion he cites back to the Complaint ¶¶ 59–67. Plaintiffs also cite to Mr. DeMonico's declaration which includes allegations that Mr. Graves "participated" in making and selling trigger with Valor. Dkt. 54-6 ¶¶ 4, 8. Mr. DeMonico claims he learned of Mr. Grave's "participation" (which is unspecified) through hearsay statements.[7] As none of these factual allegations are found in the Complaint, Mr. Graves was deprived of the opportunity to rebut these false allegations. The Court should not allow Plaintiffs to avoid serving Mr. Graves with an amended complaint by effectively amending their complaint through a motion for default judgment and bypassing Rule 5(a)(2).

While the decision to enter default judgment is committed to the district court's sound discretion, in exercising that discretion, the Court considers that strong policies favor resolution of disputes on their merits. *Ruplinger v. Rains*, 946 F.2d 731, 732 (10th Cir. 1991). Defendant accepts that his unresponsiveness led to this Court's ruling, however, the unchallenged facts contained in the Complaint do not support the default judgment.

> A party may not simply sit out the litigation without consequence. *See Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444-45 (10th Cir. 1983) ("[A] workable system of justice requires that litigants not be free to appear at their pleasure. We therefore must hold parties and their attorneys to a reasonably high standard of diligence in observing the courts'

---

[7] Even accepting Mr. DeMonico's hearsay evidence does not establish that Mr. Graves is joint and severally liable for any and all infringing acts carried out be Valor.

> rules of procedure. The threat of judgment by default serves as an incentive to meet this standard."). One such consequence is that, upon the entry of default against a defendant, the well-pleaded allegations in the complaint are deemed admitted. See 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2688.1 (4th ed., 2022 rev.). "Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Id.* A court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002). Although "[s]pecific facts are not necessary" in order to state a claim, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*per curiam*) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (quotation and citation omitted).

*United States v. Noell*, CIVIL 22-cv-02538-PAB-SP, at *3-5 (D. Colo. June 27, 2023). Here, the

original complaint fails to establish well-pleaded facts, that if accepted as true, result in a finding of

patent infringement. The allegations against Mr. Graves were that he promoted the product. This

action cannot constitute patent infringement, as a matter of law. Because default judgments are

disfavored, "strict compliance with the legal prerequisites" is required, including Rule 5(a) and

Rule 4 requiring personal service of pleadings asserting new or additional claims for relief. *Varnes*

*v. Local 91, Glass Bottle Blowers*, 674 F.2d 1365, 1369-70 (11th Cir. 1982). These Rules may not

be subverted by "pleading" additional facts through declarations submitted at a prove-up hearing.

In summary, the default judgment is based upon the original complaint which was a legal

nullity at the time having been superseded by the First Amended Complaint which was served

upon some Defendants, but not Mr. Graves. The Plaintiffs avoided serving the amended complaint

on Mr. Graves, choosing instead to add facts needed to support a default judgment via declarations

in the prove-up hearing. The default judgment must be based on the well-pleaded facts of the

complaint which do not support the judgement, as a matter of law.  For these reasons, Defendant respectfully requests the Court to vacate the default judgment.

## B. <u>Judgement was Satisfied—Rule 60(b)(5)</u>

On March 8, 2022, Plaintiffs filed against BDU and Blackstock alleging that the ALAMO-15 triggers infringe.[8]  Ex. A ¶¶ 18–19.  As Plaintiffs acknowledge, Blackstock, Inc., is the company that owns Powered By Graves, Inc. ("PBG").  Dkt. 2 ¶ 67; *see also* Dkt. 36, ¶ 75 (PBG "was formed and is owned and/or controlled by Blackstock, Inc., a Florida corporation.") (*citing* Ex. D).  The triggers that were the subject of the Florida suit ***are the same exact triggers that are at issue in this case.***  Indeed, the section of both complaints entitled "The Infringing Trigger" appear to be identical.  *Compare id.* ¶¶ 47–56 *to* Dkt. 2 ¶¶ 49–58.  These trigger would made by the other defendants in this case on behalf of PBG and Blackstock and sold by BDU.  Plaintiffs settled the Florida case, as reflected in a consent judgment entered on October 19, 2022.  Ex. B.  Parties "agreed to terms of compensation for the infringement" in a confidential settlement agreement.  *Id.* ¶ 21.

On or about July 8, 2024, Mr. Graves contacted the attorney that represented BDU and Blackstock in the Florida matters, Adam V. Floyd.  Mr. Floyd agreed to represent Mr. Graves on a *pro bono* basis for the sole purpose of settlement believing the matter could be quickly resolved by speaking with the Plaintiffs' attorney who was likely unaware of the settlement agreement.  After Mr. Floyd discovered that Glenn Bellamy, the same attorney that represented Plaintiffs in Florida, was again representing them, Mr. Floyd confronted Mr. Bellamy, who refused to provide any explanation for why he was attempting to obtain further recovery in view of the settlement

---

[8] In the interest of avoiding confusion, there was a companion suit in Florida involving the same Plaintiffs and some of the same Defendants, pertaining to another trigger.  *Rare Breed, et al. v. Big Daddy Enterprises, et al.*, 21-cv-001491 (N.D. Florida–Gainesville).

agreement. Mr. Floyd arranged a declaration from BDU and Blackstock indicating their belief that the ALAMO-15 triggers are covered by the terms of the settlement agreement. Ex. C. Because the settlement agreement is confidential, a copy could not be provided to Mr. Graves or this Court, however, BDU and Blackstock did indicate they had no objection to Mr. Graves, this Court, and Janeway receiving a copy of the agreement. *Id.* . In addition, it is public record that the settlement agreement was in compensation for the infringement asserted in both cases. Ex. B. Thus, Plaintiffs have received full, or at least partial, compensation for the ALAMO-15 triggers at issue in this case. As such, the default judgment should be vacated or at least modified under Rule 60(b)(5).

## III. Conclusion

Defendant respectfully moves the Court to vacate the default judgment entered against him. The judgment was based upon the original complaint which had ceased to have legal effect. In addition, the judgment was not supported by the well-pleaded facts of the original complaint, but rather necessarily relied upon facts alleged in the Plaintiffs Second Motion for Default Judgment and accompanying declarations. Lastly, the judgement was satisfied in full or in part by a prior settlement agreement which is in the Plaintiffs' possession.

*Thomas Allen Graves*

Adam V. Floyd
Texas Bar No. 00790699
3203 Bluffs Lane
Parker, Texas 75002
No appearance is entered as counsel of record

# EXHIBIT A

US010514223B1

## (12) United States Patent
### Rounds

(10) Patent No.: **US 10,514,223 B1**
(45) Date of Patent: **Dec. 24, 2019**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **Wolf Tactical LLC**, Buda, TX (US)

(72) Inventor: **Jeffrey Cooper Rounds**, Buda, TX (US)

(73) Assignee: **Wolf Tactical LLC**, Buda, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/143,624**

(22) Filed: **Sep. 27, 2018**

### Related U.S. Application Data

(60) Provisional application No. 62/565,247, filed on Sep. 29, 2017.

(51) **Int. Cl.**
| | |
|---|---|
| F41A 19/43 | (2006.01) |
| F41A 19/14 | (2006.01) |
| F41A 19/10 | (2006.01) |
| F41A 19/12 | (2006.01) |
| F41A 17/82 | (2006.01) |

(52) **U.S. Cl.**
CPC .............. **F41A 19/43** (2013.01); **F41A 19/10** (2013.01); **F41A 19/12** (2013.01); **F41A 19/14** (2013.01); **F41A 17/82** (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/10; F41A 19/12; F41A 19/14; F41A 19/43; F41A 17/82
USPC ............. 89/136, 139; 42/69.01, 69.02, 69.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,704,153 A * 1/1998 Kaminski ............. F41A 17/063
42/117

| | | | |
|---|---|---|---|
| 6,101,918 | A | 8/2000 | Akins |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,398,723 | B1 | 7/2008 | Blakley |

(Continued)

FOREIGN PATENT DOCUMENTS

TW 409847 U 10/2000

*Primary Examiner* — Bret Hayes
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism for use in a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. The trigger mechanism includes a hammer, a trigger member, and a locking bar. The hammer has a sear notch and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. The trigger member has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions. The trigger member has a surface positioned to be contacted by hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position. The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the release position, and is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**7 Claims, 4 Drawing Sheets**



# US 10,514,223 B1

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,513,076 | B2 * | 12/2016 | Kolev ...................... F41A 3/12 |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,939,221 | B2 | 4/2018 | Graves |
| 2007/0199435 | A1 * | 8/2007 | Hochstrate ............... F41A 3/66 |
| | | | 89/191.02 |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2017/0219307 | A1 * | 8/2017 | Foster .................... F41A 19/06 |
| 2018/0066911 | A1 | 3/2018 | Graves |
| 2018/0087860 | A1 * | 3/2018 | Sullivan ................. F41A 17/46 |

* cited by examiner

U.S. Patent          Dec. 24, 2019          Sheet 1 of 4          US 10,514,223 B1



**FIG. 1**



**FIG. 2**

**U.S. Patent**   Dec. 24, 2019   Sheet 2 of 4   **US 10,514,223 B1**



**FIG. 3**

**U.S. Patent**     Dec. 24, 2019     Sheet 3 of 4     **US 10,514,223 B1**



**FIG. 4**

U.S. Patent          Dec. 24, 2019          Sheet 4 of 4          US 10,514,223 B1



FIG. 5

US 10,514,223 B1

**1**

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 62/565,247 filed Sep. 29, 2017, and incorporates the same herein by reference.

## TECHNICAL FIELD

This invention relates to a firearm trigger mechanism. More particularly, it relates to a semiautomatic trigger that is mechanically reset by movement of the hammer when it is reset by the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunitions propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Other devices have been offered that facilitate the bump fire process. One is shown in U.S. Pat. No. 6,101,918, issued Aug. 15, 2000, to William Akins for a Method and Apparatus for Accelerating the Cyclic Firing Rate of a Semiautomatic Firearm. This device, sold for some time as the Akins Accelerator™, allowed the receiver and action of the firearm to move longitudinally relative to the butt stock and used a spring to assist forward return movement. Other devices, such as that shown in U.S. Pat. No. 8,127,658, issued Mar. 6, 2012, and other patents owned by Slide Fire Solutions provide a replacement stock and handgrip assembly that facilitates bump firing, but without spring assistance.

**2**

Other solutions to increase the rate of semiautomatic fire include pull/release trigger mechanisms. These devices cause one round to be fired when the trigger is pulled and a second round to be fired when the trigger is released. Such a device is shown in U.S. Pat. No. 8,820,211, issued Sep. 2, 2014, entitled Selectable Dual Mode Trigger for Semiautomatic Firearms. A device like this is offered by FosTecH Outdoors, LLC as the ECHO TRIGGER™. Another device, offered by Digital Trigger Technologies, LLC under the name DigiTrigger™, provides a dual mode trigger in which the pull/release operating function is achieved electronically.

The above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. This invention, however, does not provide a "drop-in" solution for existing popular firearm platforms, like the AR15, AK47 variants, or the Ruger 10/22™. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to be forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures; wherein:

FIG. 1 is an isometric view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention;

FIG. 2 is a partially cut-away view thereof;

FIG. 3 is a longitudinal section view showing the module of the embodiment installed in a typical AR15-pattern lower receiver in a cocked and ready to fire status with the bolt and bolt carrier in an in-battery position;

FIG. 4 is a similar view in which the trigger has been pulled and the hammer has fallen against a firing pin; and

FIG. 5 is a similar view showing the bolt carrier in a retracted position, forcing the hammer and trigger into a reset status.

US 10,514,223 B1

**3**

### DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments.

Referring first to FIGS. 1 and 2, therein is shown at 10 a "drop-in" trigger module adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatics firearm platforms, such as the Ruger 10/22™ or AK-pattern variants.

The module 10 includes a frame or housing 12 that may be sized and shaped to fit within the internal fire control mechanism pocket of an AR-pattern lower receiver. It includes first and second pairs of aligned openings 14, 16 that are located to receive transverse pins (40, 36, respectively, shown in FIGS. 3-5) used in a standard AR-pattern trigger mechanism as pivot axes for the hammer and trigger member, respectively. The housing 12 includes left and right sidewalls 20, 22, which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls 20, 22 may be interconnected at the bottom of the housing 12 at the front by a crossmember 24.

A hammer 18 of ordinary (MIL-SPEC) AR-pattern shape and construction may be used. The illustrated hammer 18 may be standard in all respects and biased by a typical AR-pattern hammer spring (not shown).

A modified trigger member 26 may be sized to fit between the sidewalls 20, 22 of the housing 12 and may include a trigger blade portion 28 that extends downwardly. The trigger blade portion 28 is the part of the trigger member 26 contacted by a user's finger to actuate the trigger mechanism. The trigger blade portion 28 may be curved (shown) or straight, as desired. The trigger member 26 may pivot on a transverse pin 36 (not shown in FIGS. 1 and 2) that extends through aligned openings 16 in the sidewalls 20, 22 of the housing 12. The same pin 36 is aligned and positioned within aligned openings 47 of a lower receiver 50 to assemble the module 10 into a fire control mechanism pocket 49 of the lower receiver 50, as shown in FIGS. 3-5, for example. The modified trigger member 26 may have integral first and second contact surfaces 30, 32. Some part of the trigger member 26 includes contact surfaces for interaction with the hammer 18 and locking bar 62. For

**4**

example, the trigger member 26 can include first and second upwardly extended rear contact surfaces 30, 32. The first contact surface 30 is positioned to interact, for example, with a tail portion 44 of the hammer 18 that extends rearwardly from a head part 42 of the hammer 18. The second contact surface 32 is positioned to interact with a locking bar 62. The contact surfaces may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin 36, with no lost motion between the parts.

The hammer 18 may include bosses 34 coaxial with a transverse pivot pin opening 38 that receives an assembly/pivot pin 40 (not shown in FIGS. 1 and 2) through the first set of aligned openings 14 in the housing 12 (and through openings 51 in the firearm receiver, to position the trigger module 10 within the fire control mechanism pocket 49 of the lower receiver 50, as shown in FIGS. 3-5). The bosses 34 may fit between the sidewalls 20, 22 of the housing 12 to laterally position the hammer 18, or can be received in the openings 14 (if enlarged) so that the hammer 18 stays assembled with the module 10 when the hammer's pivot pin is removed and/or when the module 10 is not installed in a firearm receiver. The hammer 18 includes a head portion 42 and a tail portion 44. The hammer 18 also includes a sear catch 46 that engages the sear 48 on the trigger member 26, when cocked. The trigger and hammer pins 36, 40 provide pivot axes at locations (openings 47, 51, shown in FIGS. 3-5, for example) standard for an AR-pattern fire control mechanism. Although FIGS. 3-5 are a longitudinal section view and only show one of the aligned openings 47, 51, it is understood that a typical AR15-pattern lower receiver 50 includes second, corresponding and aligned openings 47, 51 in the half of the receiver 50 not shown.

Referring now also to FIG. 3, the trigger module 10 is shown installed in the fire control mechanism pocket 49 of an AR-pattern lower receiver 50. Other lower receiver parts not important to the present invention are well-known in the art and are omitted from all figures for clarity. As is well-known in the art, the bolt carrier assembly 52 (or blow-back bolt) would be carried by an upper receiver (not shown) and engage the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The hammer 18 is shown in a cocked position and a bolt carrier assembly 52 is shown in an in-battery position. The sear 48 engages the sear catch 46 of the hammer 18.

The bolt carrier assembly 52 used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface 54 in a tail portion 56 of the bolt carrier body 58. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible. The semiautomatic AR-pattern safety selector switch 60 may also be standard (MIL-SPEC) in all respects.

The trigger module of the present invention includes a trigger locking bar 62 carried on a frame 66 for pivotal movement on a transverse pivot pin 68. The frame 66 may be part of the module housing 12, if configured as a "drop-in" unit. An upper end of the locking bar 62 extends above the upper edge of the housing 12 and lower receiver 50 to be engaged by the engagement surface 54 of the bolt

US 10,514,223 B1

**5**

carrier body **58** when the bolt carrier assembly **52** is at or near its in-battery position (as shown in FIG. 3). Contact between the engagement surface **54** and upper end of the locking bar **62** causes the locking bar **62** to pivot into a first position (FIG. 3) against a biasing spring **70** and allows pivotal movement of the trigger member **26**. If desired, the locking bar **62** may include a rearward extension **64** that serves as a means to limit the extent to which it can pivot toward the blocking position.

Referring now also to FIG. 4, when the safety selector **60** is in the "fire" position (as shown in all figures), finger pressure pulling rearward against the trigger blade portion **28** causes the trigger member **26** to rotate on the pivot pin **36**, as indicated by arrows. This rotation causes the sear **48** to disengage from the sear catch **46** of the hammer **18**. This release allows the hammer **18** to rotate by spring force (hammer spring omitted for clarity) into contact with the firing pin **72**. Any contact between the rear portion of the trigger member **26** and front surface of the locking bar **62** will simply cause the locking bar **62** to rotate out of the way, as illustrated in FIG. 4.

Referring now to FIG. 5, discharging an ammunition cartridge (not shown) causes the action to cycle by moving the bolt carrier assembly **52** rearwardly, as illustrated. The same effect occurs when the action is cycled manually. As in an ordinary AR15-pattern configuration, a lower surface **76** of the bolt carrier body **58** pushes rearwardly against the head portion **42** of the hammer **18**, forcing it to pivot on the hammer pivot/assembly pin **40** against its spring (not shown) toward a reset position. As the rearward movement of the bolt carrier body **58** and pivotal movement of the hammer **18** continues, mechanical interference or contact between a rear surface **74** of the hammer **18** (such as on the tail portion **44**) and a contact surface **30** of the trigger member **26** forces the trigger to pivot (arrows in FIG. 5) toward and to its reset position. At the same time, as the trigger member **26** is reset, the biasing spring **70** moves the lower end of the locking bar **62** into a second position (FIG. 5) in which it blocks pivotal movement of the trigger **26**, including by finger pressure applied (or reapplied) to the trigger blade **28**. Thus, as the bolt carrier assembly **52** returns forward, the trigger member **26** is held in its reset position by the locking bar **62** where the hammer sear catch **46** will engage with the sear **48** carried on the trigger member **26** to reset the fire control mechanism. The trigger member **26** cannot be pulled to release the sear/hammer engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **52** and firing pin **72** as the bolt carrier assembly **52** is returning to battery. A trigger return spring (not shown) of the type used in a standard AR-pattern trigger mechanism may be unnecessary in this case, because the trigger member **26** is forced to return by the hammer **18**, but may be used, if desired.

When the bolt carrier assembly **52** has reached (or nearly reached) its closed, in-battery position (shown in FIG. 3), the engagement surface **54** of the bolt carrier tail portion **56** contacts and forwardly displaces the upper end of the locking bar **62**, disengaging the second contact surface **32** of the trigger member **26**, allowing the trigger **26** to be pulled a second time. The distance of travel during which there is no interference between the locking bar **62** and second contact surface **32** of the trigger member **26**, allowing the trigger member **26** to be manually displaced, may be about from about 0.10 to 0.31 inch. This prevents early release of the hammer **18** and contact of the hammer against the firing pin **72** before the bolt is completely locked and in-battery.

**6**

Force applied by the user's trigger finger against the trigger blade portion **28** is incapable of overcoming the mechanical interference and force of the hammer **18** against the contact surface **30** of the trigger member **26**. However, the trigger can immediately be pulled again—only by application of an external force—as soon as the locking bar **62** has been rotated against the spring **70** and out of blocking engagement with the trigger member **26**, as the bolt carrier assembly **52** approaches or reaches its in-battery position. This allows the highest possible standard rate of fire, without risk of hammer-follow, for the semiautomatic action of the firearm.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1.** For a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a hammer having a sear notch and mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions;

a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in a frame and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**2.** The trigger mechanism of claim **1**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**3.** The trigger mechanism of claim **1**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

**4.** For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and

US 10,514,223 B1

7          8

released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

**5**. The trigger mechanism of claim **4**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**6**. The trigger mechanism of claim **4**, wherein the housing's transversely aligned pairs of openings for receiving hammer and trigger assembly pins are aligned with the assembly pin openings in the fire control mechanism pocket of the receiver.

**7**. The trigger mechanism of claim **4**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

\*   \*   \*   \*   \*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Florida

| | |
|---|---|
| Rare Breed Triggers, LLC and ABC IP, LLC | ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Big Daddy Unlimited, Inc., Big Daddy Enterprises, Inc., and Blackstock, Inc. | ) ) ) |
| _____ | ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Big Daddy Unlimited, Inc.
STEVEN KALISHMAN, P.A., Registered Agent:
5055 SOUTHWEST 91ST TERRACE
GAINESVILLE, FL 32608

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Glenn D. Bellamy
Wood herron & Evans LLP
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
Tel: 513-707-0243
gbellamy@whe-law.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____               _____
                                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                          *Server's signature*

                                                          _____
                                                          *Printed name and title*

                                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Florida

| | |
|---|---|
| Rare Breed Triggers, LLC and ABC IP, LLC <br><br>_____<br> *Plaintiff(s)*<br>v.<br>Big Daddy Unlimited, Inc., Big Daddy Enterprises, Inc., and Blackstock, Inc.<br>_____<br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

    Big Daddy Unlimited, Inc.
    STEVEN KALISHMAN, P.A., Registered Agent:
    5055 SOUTHWEST 91ST TERRACE
    GAINESVILLE, FL 32608

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

    Glenn D. Bellamy
    Wood herron & Evans LLP
    2700 Carew Tower
    441 Vine Street
    Cincinnati, OH 45202
    Tel: 513-707-0243

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                     *Server's signature*

                                         _____
                                                     *Printed name and title*

                                         _____
                                                     *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Florida

| | |
|---|---|
| Rare Breed Triggers, LLC and ABC IP, LLC ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| Big Daddy Unlimited, Inc., Big Daddy Enterprises, ) | |
| Inc., and Blackstock, Inc. ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Big Daddy Unlimited, Inc.
> STEVEN KALISHMAN, P.A., Registered Agent:
> 5055 SOUTHWEST 91ST TERRACE
> GAINESVILLE, FL 32608

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Glenn D. Bellamy
> Wood herron & Evans LLP
> 2700 Carew Tower
> 441 Vine Street
> Cincinnati, OH 45202
> Tel: 513-707-0243

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .


I declare under penalty of perjury that this information is true.


Date: _____          _____
                                          *Server's signature*

                                 _____
                                          *Printed name and title*

                                 _____
                                          *Server's address*

Additional information regarding attempted service, etc:

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| **RARE BREED TRIGGERS, LLC, a North Dakota limited liability company, and ABC IP, LLC, a Delaware limited liability company,** | ) ) ) ) ) | CASE NO. _____ |
| **Plaintiffs.** | ) ) ) | **JURY TRIAL DEMANDED** |
| -vs- | ) ) | |
| **BIG DADDY UNLIMITED, INC., a Florida corporation, BIG DADDY ENTERPRISES, INC., a Florida corporation, and BLACKSTOCK, INC., a Florida Corporation,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) ) | |

---

## COMPLAINT FOR PATENT INFRINGEMENT

---

This is an action for patent infringement in which Rare Breed Triggers, LLC ("Rare Breed") and ABC IP LLC ("ABC") (collectively, "Plaintiffs") accuse Big Daddy Unlimited, Inc. ("BDU"), Big Daddy Enterprises, Inc. ("BDE"), and Blackstock, Inc. ("Blackstock") (collectively "Defendants"), of infringing U.S. Patent No. 10,514,223 ("the '223 Patent") as follows:

Exhibit A

## PARTIES

1.    Rare Breed is a limited liability company organized under the laws of the State of North Dakota with an address at 3523 45th Street South, Suite 100, Fargo, ND 58104.

2.    ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

3.    Upon information and belief, BDU is a corporation organized under the laws of the State of Florida with a place of business at 7600 NW 5th Place, Gainesville, Florida 32607and is a subsidiary of BDE and/or Blackstock.

4.    Upon information and belief, BDE is a corporation organized under the laws of the State of Florida with a place of business at 6915 NW 4th Blvd., Suite A, Gainesville, FL 32607 and is a subsidiary of Blackstock.

5.    Upon information and belief, Blackstock is a corporation organized under the laws of the State of Florida with a place of business at 7600 NW 5TH Place, Gainesville, FL 32607, is the incorporator/owner of Powered By Graves, Inc., an Oklahoma corporation, and controls its subsidiaries BDU and BDE.

## JURISDICTION AND VENUE

6.    This is an action for patent infringement arising under 35 U.S.C. §§ 271(a)-(b), 281, and 284-85.

COMPLAINT - 2 -

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338, which directs that United States District Courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents and pursuant to 28 U.S.C. § 1331, which pertains to civil actions arising under the laws of the United States.

8.     Personal jurisdiction over Defendants is proper in this District because Defendants reside in and/or have a place of business his district.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Defendants reside in this district and/or have a regular and established place of business in this District.

## **BACKGROUND**

10.    This lawsuit asserts infringement of the '223 Patent. A true and correct copy of the '223 Patent is attached hereto as Exhibit A.

11.    ABC is the current assignee and owner of all right, title and interest in and to the '223 Patent. This assignment has not been recorded at the United States Patent and Trademark Office ("USPTO"). Rare Breed has the exclusive license and right to sell products covered by the '223 Patent.

12.    Upon information and belief, Defendants have committed acts of patent infringement, which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful.

13.   The Plaintiffs and Defendants operate in the firearms industry.

14.   Plaintiffs are responsible for developing the first commercial forced reset semiautomatic trigger, including the Rare Breed FRT-15™ for use in the AR-15 weapon platform. The FRT-15™ trigger is one embodiment of the '223 Patent's invention.

15.   For the entire time the FRT-15™ has been marketed and sold by Rare Breed, it has been marked with a patent notice complying with 35 U.S.C. § 287. The patent number is engraved on the product and displayed on packaging as shown below:



16.   The Rare Breed FRT-15™ trigger was first introduced to the market in December 2020. It is unique, being the only hammer-forced-reset semiautomatic trigger on the market and exclusively protected by the '223 Patent. The unique FRT-

15™ trigger created a new market for the product that did not exist before. The FRT-15™ trigger has been the subject of much publicity, consumer interest, and vigorous sales.

17.    Defendants are responsible for misappropriating Plaintiffs' proprietary technology and selling it as their own in direct competition with Rare Breed.

18.    On December 17, 2021, counsel for Plaintiffs informed counsel for BDU and BDE that a preproduction model of the ALAMO-15 (the Alamo Triggers Graves Star-Fire V2 A.R.T., depicted below) had been examined and expressly accused it of infringing the '223 Patent in open court (*Rare Breed Triggers, LLC, et al. v. Big Daddy Enterprises, Inc., et al.*, Case No. 1;21-cv-149, N.D. Florida).



19.    On or about February 25, 2022, Defendants began offering the "PBG ALAMO-15" trigger (the "Infringing Device"), pictured in Paragraph 48, below, for sale.

## Background

20.    Graves was issued U.S. Patent Nos. 9,568,264, issued February 14, 2017, and 9,816,722, issued November 4, 2017 ("the Flex-Fire Technology Patents"), for what he called Flex-Fire Technology.

21.    The Flex-Fire Technology Patents disclosed a trigger reset mechanism in which the gun's bolt, and not the hammer, reset the trigger.

22.    Wolf Tactical found Graves' Flex-Fire Technology not readily adaptable to the AR-platform.

23.    So, a new invention was made by Jeffrey Cooper Rounds ("Rounds") of Wolf Tactical that used movement of the hammer, rather than the bolt (or bolt carrier), to reset the trigger in combination with a locking bar that keeps the trigger from being pulled again until the action returns to battery (i.e., the bolt carrier and bolt returns to the closed, "in-battery" position). This new invention is embodied and claimed in the '223 Patent, which was assigned to Wolf Tactical. Although not limited to use in an AR-pattern firearm, it is readily adaptable thereto, including as a "drop-in" trigger assembly.

24.    Wolf Tactical assigned the '223 Patent to Rare Breed, who then assigned it to ABC.

25.    Later, Graves was issued U.S. Patent No. 9,939,221, issued April 10, 2018, and titled "Flex-Fire G2 Technology." This patent resulted from a

continuation-in-part application filed November 13, 2017, after the priority date of the '223 Patent. The Flex-Fire G2 Technology Patent also disclosed a trigger reset mechanism in which the gun's bolt, and not the hammer, reset the trigger.

26.    On January 31, 2018, Graves granted to Wolf Tactical, LLC ("Wolf Tactical") of Buda, Texas, an exclusive license ("the Graves License") to these patents (U.S. Patent Nos. 9,568,264; 9,816,722; and 9,939,221) to "develop, manufacture, make, use, offer for sale, import, and export" products covered by the patents for "AR-pattern firearms." Thus, Graves would be precluded from making, using, selling, or offering for sale a device covered by the Graves Flex-Fire Technology Patents or the Flex-Fire G2 Technology Patent for AR-pattern firearms without first obtaining a sublicense from Wolf Tactical or its assignee.

27.    In designing the PBG ALAMO-15 trigger (the "Infringing Device"), Defendants copied the invention disclosed and claimed in the '223 Patent. The Infringing Device is a "drop-in" assembly that uses contact of the hammer, rather than the bolt (or bolt carrier), to reset the trigger in combination with a locking bar that keeps the trigger from being pulled again until the action returns to battery.

28.    The Infringing Device uses a roller on the locking bar. This modification does not exclude the Infringing Device from the scope of the '223 Patent claims.

**The '223 Patent Invention**

29.     The '223 Patent provides a novel device for accelerating the firing sequence of any semiautomatic firearm, in contrast to a standard semiautomatic trigger or other prior art devices that allow accelerated rate of semiautomatic firing. While the '223 Patent may be adapted to many types of firearms (including, but not limited to, AR-pattern firearms), the Plaintiffs' FRT-15™ trigger was designed as a drop-in replacement particularly to fit AR-15 pattern firearms.

30.     An example of the Rare Breed FRT-15™ trigger is shown in Paragraph 15, above.

31.     A standard AR-15 pattern firearm, for example, is a semiautomatic firearm. In standard semiautomatic firearms, the trigger releases a sear which allows a hammer to contact a firing pin and fire a chambered ammunition cartridge, i.e., a "round." Part of the force that propels the round is used to cycle the rifle's bolt/bolt carrier or "action" in a rearward direction which extracts and ejects the spent cartridge. Springs at the rear of the bolt carrier act to return the bolt to its original firing position (i.e., into battery), and while so returning, a new cartridge (i.e., "round") is placed in the firing chamber. The longitudinal reciprocation of the bolt also resets the hammer and enables the weapon to be fired again. This process can be seen in the sequence of illustrations below.

32.     For background context, the following is a depiction and description of the operation of a *standard* **AR-pattern trigger mechanism**:



33.     The trigger is shown in purple. The hammer is shown in brown. The disconnector is shown in green. The bolt carrier is shown in blue.

34.     The process is commenced by the trigger being pulled by the user. The trigger releases the hammer from the trigger sear and allows the hammer to strike the firing pin.



COMPLAINT - 9 -

35.    A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm.



36.    The rear-ward movement of bolt carrier cocks the hammer on the disconnector and allows the bolt to return into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer in a cocked position.

37.    The '223 Patent is a semiautomatic trigger that represents improvement on the above-described technology because it makes the disconnector unnecessary by forcibly returning the trigger to the reset state.

38.    In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is

reset by a trigger spring when the user lets the trigger reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to manually reset the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, leaving the hammer uncocked.

39. The '223 Patent invention does not require a disconnector in the trigger mechanism. The '223 Patent teaches a forcible reset of the trigger by the hammer while the bolt returns to the in-battery position. The '223 Patent also teaches a "locking bar" which limits movement of the trigger. The locking bar acts to prevent the trigger from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position. This is depicted in the illustrations below.

40. The following is a reproduction of a representative trigger assembly according to an embodiment of the '223 Patent:

COMPLAINT - 11 -



41.     The trigger is shown in red. The hammer is shown in brown. The

locking bar is shown in green. The bolt carrier is shown in blue.



42.     When the trigger is pulled, the hammer is released, which strikes the

firing pin carried in the bolt carrier.

43.     As the round fires, propellant gas pressure causes the action to cycle.

This begins the process of sending the bolt carrier toward the rear of the firearm.



44.    As the bolt carrier moves toward the rear of the firearm, the bolt carrier engages with and cocks the hammer. The invention of the '223 Patent provides that the hammer forcibly resets the trigger. Simultaneously, the locking bar engages with the trigger and mechanically prevents the shooter from pulling the trigger until the locking bar is reset. The locking bar cannot be reset until the bolt carrier returns to its in-battery position.

45.    As the bolt carrier returns forward to its in-battery position, a new round is inserted into the chamber and the bolt closes. As the bolt closes, the bolt carrier contacts and pivots the locking bar, freeing the trigger to be pulled again by the user and the firing process repeated.

46.    The claims of the '223 Patent define the scope of the invention. For example, Claim 4 specifies a housing, a hammer, a trigger member, and a locking bar.

**The Infringing Trigger**

47.     Defendant is currently making, using, selling, and/or offering for sale a version of Plaintiffs' FRT-15™ trigger assembly, which embodies the technology claimed in the '223 Patent.

48.     Defendants' infringing trigger assembly is called the "ALAMO-15" ("the Infringing Device").  The Infringing Device is a "drop-in" replacement trigger assembly for an AR-pattern firearm. Exemplary photographs of the Infringing Device are shown below:



49.     Below is an illustration of internal components, primarily the trigger, hammer, locking bar, and springs, of the Infringing Device.



50.     Defendants' Infringing Device employs and embodies the technology claimed by the '223 Patent by using the hammer contact to forcibly reset the trigger and preventing the trigger from being pulled again until the forward action of the bolt carrier disengages the locking bar from the trigger, as specified in the claims of the '223 Patent. Furthermore, the Infringing Device includes a housing with transversely aligned pairs of openings for receiving hammer and trigger assembly pins, as specified in Claim 4 of the '223 Patent.

51.     FIG. 2 of the '223 Patent, shown below, is illustrative of one embodiment of the invention. FIG. 2 depicts a "drop-in" trigger assembly (with the housing partially cut away).



**FIG. 2**

52.     The hammer 18 includes a sear catch 46 that engages the sear 48 on the trigger member 26, when cocked.

53.     FIG. 3 is representative of one embodiment of the locking bar 62 and its relationship with the trigger 28, hammer 18, and bolt carrier 56.



**FIG. 3**

54.     The user can rotate a safety selector (60) between safe and fire (forced reset semiautomatic with locking bar) modes.

55.    For the reasons discussed in more specificity below, the Infringing Device infringes at least one claim of the '223 Patent and thus, Defendants are liable for patent infringement pursuant to 35 U.S.C. § 271.

56.    In view of the Defendants' defiance of Rare Breed's prior express infringement accusation in advance of commercial sale of the Infringing Device, the infringement is willful.

### Sale of the Infringing Trigger

57.    BDU has published promotional videos, such as that which can be viewed at https://www.youtube.com/watch?v=j5TNi8gYg8Y. This video instructs viewers to go to GRAVESTRIGGERBDU.COM to purchase the Infringing Device, displaying the URL as shown in the screen capture image below:



58.    The GRAVESTRIGGERBDU.COM URL leads the customer to a website for them to access BDU, as shown in the scree capture image below;

COMPLAINT - 17 -



59. Another such promotional video can be viewed at https://www.youtube.com/watch?v=3nUJdmBZ_8U. This promotional video instructs customers to visit POWEREDBYGRAVES.COM to purchase the Infringing Device, as shown in the screen capture image below from the video:



60. The POWEREDBYGRAVES.COM website allows customers to purchase the Infringing Device without paying the BDU membership fee. This

website displays a contact address of 6921 NW 22nd St., Suite B, Gainesville, FL 32653

61.    On information and belief, Powered By Graves, Inc. is owned and controlled by Blackstock, Inc., a Florida corporation.

## COUNT I – INFRINGEMENT OF THE '223 PATENT

62.    The allegations set forth in paragraphs 1-61 are fully incorporated into this First Count for Relief.

63.    Upon information and belief, Defendants have and continue to directly and/or indirectly infringe, including through the doctrine of equivalents, at least Claim 4 of the '223 Patent by making, using, selling, offering for sale, importing and/or promoting, providing, and causing to be used without authority within the United States, the ALAMO-15 forced reset trigger (the "Infringing Devices). This infringement was willful.

64.    An exemplary comparison of the Infringing Device with claim 4 of the '223 Patent is illustrated in the chart below:

| Claim Language | Infringing Device (ALAMO-15 Trigger) |
|---|---|
| 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer | The Infringing Device is a trigger mechanism. |

| when cycled, a trigger mechanism, comprising: |  |
| | It is for an AR-pattern firearm, which has a lower receiver with a fire control pocket and assembly pin openings in side walls of the pocket. |
| |  |
| | An AR-pattern firearm has a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. |

| | |
|---|---|
| | Bolt carrier |
| a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins; | The Infringing Device includes a housing with transversely aligned pairs of openings for receiving hammer and trigger assembly pins.<br><br>Transversly alighed pairs of openings<br>Housing |
| a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions; | The Infringing Device includes a hammer with a sear notch and is mounted in the housing to pivot on a transverse axis between set and released positions. |



| | |
|---|---|
| |  |
| a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position; | The Infringing Device includes a trigger member with a sear and that is mounted in the housing to pivot on a transverse axis between set and released positions.  |



The trigger member has a surface (shown above) positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled.



The contact causes the trigger member to be forced to the set position.

| | |
|---|---|
| a locking bar pivotally mounted in the housing and spring biased toward a first position in which | The Infringing Device includes a locking bar that is pivotally mounted in the housing. |

the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.



The locking bar is spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position.





The locking bar is movable against the spring bias to a second position when contacted by the bolt carrier reaches a substantially in-battery position. In this position, the trigger member can be moved by an external force (pull by the trigger finger) to the released position.





65.    The working components of the Infringing Device include functional reproductions of the '223 Patent when comparing the working components of the Infringing Device to the language of the claims, which is the legal standard for infringement.

66.    Because the claims describe the invention as "comprising" the enumerated elements, the scope of the claims are not limited to those elements and the inclusion of additional structures or features not specified in a claim does not avoid infringement. Thus, the addition of a roller wheel to the locking bar in the Infringing Device does not affect its infringing status.

67.    Accordingly, the Defendants' making, using, selling, offering for sale, and/or importing of the Infringing Devices is a direct and/or indirect infringement of the '223 Patent under 35 U.S.C. § 271 (a), (b), and/or (c).

68.     Sales of the Infringing Device directly compete against and unlawfully displace sales of the patented Rare Breed FRT-15™ trigger.

69.     The Infringing Device is structurally and functionally equivalent to the preproduction model shown in Paragraph 18, above.

70.     The Infringing Device is structurally and functionally equivalent to the Wide Open trigger ("WOT"), previously sold by BDU, apart from the absence of a roller wheel on the locking bar.

71.     Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, and reputation.

72.     Plaintiffs have been substantially harmed by Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter:

a.      A judgment in favor of Plaintiffs that Defendants have infringed and/or induced others to infringe the '223 Patent;

b.      A preliminary injunction enjoining Defendants and their agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or inducing the infringement of the '223 Patent during the pendency of this case, or other such equitable relief as the Court determines is warranted;

c.      A permanent injunction enjoining Defendants and their agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '223 Patent, or other such equitable relief as the Court determines is warranted;

d.      A judgment and order requiring Defendants to pay to Plaintiffs their damages, costs, expenses, and prejudgment and post-judgment interest for Defendants' infringement of the '223 Patent as provided under 35 U.S.C. § 284, and an accounting of any ongoing post-judgment infringement; and

e.      Any and all other relief, at law or equity, to which Plaintiffs may show themselves to be entitled.

## **DEMAND FOR JURY TRIAL**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED: March 8, 2022          Respectfully submitted,

*/Glenn D. Bellamy/*
Glenn D. Bellamy (Pro Hac Vice pending)
   gbellamy@whe-law.com
Charles D. Pfister (Pro Hac Vice pending)
   cpfister@whe-law.com
**WOOD HERRON & EVANS LLP**
2700 Carew Tower
441 Vine Street
Cincinnati OH 45202
Tel: (513) 707-0243
Fax: (513) 241-6234

*Attorneys for Plaintiffs*

COMPLAINT - 30 -

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| **RARE BREED TRIGGERS, LLC, et al.,** | § § § | CASE NO. 1:L21CV149-RH-HTC |
| Plaintiffs, | § § | |
| V. | § § | |
| **BIG DADDY ENTERPRISES, INC., et al.,** | § § § | |
| Defendants. | § § | |
| and | § § | |
| **RARE BREED TRIGGERS, LLC, ET AL.,** | § § § | |
| Plaintiffs, | § § | CASE NO. 1:22CV61-RH-HTC |
| V. | § § | |
| **Big Daddy Unlimited, Inc, et al.** | § § § | |
| Defendants. | § § | |

---

## CONSENT JUDGMENT AND PERMANENT INJUNCTION

---

Plaintiffs Rare Breed Triggers, LLC, and ABC IP, LLC (together,

"Plaintiffs") and Defendants in Case No. 1:21cv149-RH-HTC Big Daddy

Page 1 of 10

Exhibit B

Enterprises, Inc., Big Daddy Unlimited, Inc., Wide Open Enterprises, LLC, We

Got Ammo, Inc., Anthony McKnight, Sherrie McKnight, and Douglas Rios, and

Defendants in Case No. 1:22cv61-RH-HTC Big Daddy Unlimited, Inc., Big

Daddy Enterprises, Inc., and Blackstock, Inc. (together, "Defendants")

(collectively, "the Parties") filed a Joint Motion for Entry of Consent Judgment and

Permanent Injunction informing the Court that they have agreed to the entry of this

Final Judgment.

The Parties advise the Court that they **HEREBY STIPULATE AND**

**AGREE TO THE FOLLOWING:**

1.      These are actions for patent infringement arising under the Patent

Laws of the United States, 35 U.S.C. § 101 et. seq. and 15 U.S.C. § 1051 *et seq.*

The Court has jurisdiction over the subject matter pursuant to 15 U.S.C. § 1121

and 28 U.S.C. §§ 1331, 1332 and 1338(a).

2.      The Court has personal jurisdiction over the parties and venue is

proper pursuant to 28 U.S.C. §§ 1332(a) and 1400.

3.      Rare Breed Triggers, LLC ("Rare Breed") is a limited liability

company organized under the laws of the State of North Dakota.

4.      ABC IP, LLC ("ABC") is a limited liability company organized under

the laws of the State of Delaware.

5.     Big Daddy Enterprises, Inc. ("BDE") is a corporation organized under the laws of the State of Florida.

6.     Big Daddy Unlimited, Inc. ("BDU") is a corporation organized under the laws of the State of Florida.

7.     Wide Open Enterprises, Inc. ("WOE") is a corporation organized under the laws of the State of New Mexico.

8.     We Got Ammo, Inc. ("WGA") is a corporation organized under the laws of the State of Florida.

9.     Blackstock, Inc. ("Blackstock") is a corporation organized under the laws of the State of Florida.

10.    Anthony McKnight is an individual residing in Florida.

11.    Sherrie McKnight is an individual residing in Florida.

12.    Doug Rios is an individual residing in Florida.

13.    ABC is the owner of all right, title and interest in and to United States Patent Number 10,514,223 entitled "Firearm Trigger Mechanism" ("the '223 Patent").

14.    Rare Breed holds the exclusive license to sell products covered by the '223 Patent and has standing to collect damages for lost profits.

15.    All of the claims of the '223 Patent are valid and enforceable.

16.    The Wide Open Trigger (WOT) and Powered By Graves ALAMO-15 trigger have been accused of infringing the '223 Patent.

17.    The Parties intend that the issues of infringement, validity, and enforceability are hereby finally concluded and disposed of and that this CONSENT JUDGMENT AND PERMANENT INJUNCTION bars the Defendants from contending in this action or any other proceeding that the claims of the '223 Patent are invalid, unenforceable or not infringed.

18.    Defendants have been making or causing to be made, using or causing to be used, importing, offering to sell, and selling forced reset triggers (i.e., the Wide Open Trigger (WOT) and/or Powered By Graves ALAMO-15 trigger) which are covered by one or more claims of the '223 Patent (the "Infringing Products").

19.    At least one claim of the '223 Patent is infringed by the Infringing Products sold, offered for sale, or imported by Defendants.

20.    The Parties agree that Plaintiffs had the manufacturing capacity to produce and staff to sell all of the Infringing Products sold by Defendants, and but for the infringement would have realized significant profits and royalties from such sales.

21.    Plaintiffs and Defendants have entered into a separate Confidential Settlement Agreement in which they have agreed to terms of compensation for the infringement.

22.    Plaintiffs have no adequate remedy at law as to the threat of ongoing infringements by Defendants and are entitled to an injunction barring the ongoing sale of Infringing Products.

23.    Violation by any of the Defendants or anyone acting in concert with any of them of the Permanent Injunction granted by this CONSENT JUDGMENT AND PERMANENT INJUNCTION would cause irreparable damage to Plaintiffs and, upon violation of the injunction, Plaintiffs should be entitled to remedies consistent with this CONSENT JUDGMENT AND PERMANENT INJUNCTION.

24.    Defendants waive all right to appeal any part of this CONSENT JUDGMENT AND PERMANENT INJUNCTION.

25.    Upon entry of this Consent Judgment and Permanent Injunction, this action is dismissed with prejudice, provided, however, that this Court shall retain jurisdiction to enforce the terms and provisions of this Consent Judgment, Permanent Injunction.

Based on the Stipulations by the Parties, **IT IS HEREBY ORDERED AND ADJUDGED THAT**:

1.    Each and all of the Defendants, including any successors, agents, assigns, and transferees, all others holding by, through or under the parties hereto, and all subsidiaries, divisions, related companies or entities, and principals,

owners, investors, managers, and members of the parties and who receive actual notice of this injunction, are PERMANENTLY ENJOINED during the unexpired term of the '223 Patent from making or causing to be made, using or causing to be used, importing, offering for sale, or selling either directly, contributorily or by inducement in the United States any Infringing Products.

2.      The Permanent Injunction in Paragraph 1 shall automatically terminate and expire upon expiration of the '223 Patent or upon the entry of a final and unappealable court Order finding that the '223 Patent is invalid.

3.      All claims asserted by Plaintiffs against Defendants are hereby dismissed with prejudice

4.      The issues of infringement, validity, and enforceability are hereby finally concluded and disposed of and this CONSENT JUDGMENT AND PERMANENT INJUNCTION bars each and any of the Defendants from contending in this action or any other proceeding that the claims of the '223 Patent are invalid, unenforceable or not infringed.

5.      This CONSENT JUDGMENT AND PERMANENT INJUNCTION shall finally conclude and dispose of this litigation as to the Parties, and Plaintiffs and Defendants shall be entitled to issue preclusion, claim preclusion, *res judicata* and collateral estoppel effect in future litigation or Patent Office proceedings related to the '223 Patent. This Order explicitly intends such issue preclusion,

claim preclusion, *res judicata* and collateral estoppel effects to extend to the issues of infringement, validity, and enforceability regarding any claim of the '223 Patent, whether raised in a court proceeding, Patent Office proceeding, reexamination, *inter partes* review or other dispute.

6.     The Court finds that violation of the Permanent Injunction granted by this CONSENT JUDGMENT AND PERMANENT INJUNCTION each or any of the Defendants would cause irreparable damage to Plaintiffs and, upon violation of the injunction, Plaintiffs shall be entitled to remedies consistent with this CONSENT JUDGMENT AND PERMANENT INJUNCTION.

7.     This CONSENT JUDGMENT AND PERMANENT INJUNCTION shall bind all parties, including any successors, assigns, and transferees, all others holding by, through or under the parties hereto, and all subsidiaries, divisions, related companies or entities, and principals, owners, investors, managers, and members of the parties.

8.     All parties have read this CONSENT JUDGMENT AND PERMANENT INJUNCTION, have been advised by counsel, and agree to be fully bound by its terms.

9.     This Court retains exclusive jurisdiction of this action for the purpose of compliance with this CONSENT JUDGMENT AND PERMANENT INJUNCTION.

10.    Final judgment shall be entered pursuant hereto, without further

notice.

The Clerk is directed to enter this Final Judgment forthwith.


Ordered this 19th day of October,          s/Robert L. Hinkle
2022.                             _____
                                        ROBERT L. HINKLE
                                  UNITED STATES DISTRICT JUDGE

CONSENT TO BE BOUND:

**Big Daddy Enterprises, Inc.**

Anthony McKnight, CEO

Date: _10 - 10 - 22_

**Big Daddy Unlimited, Inc.**

Anthony McKnight, CEO

Date: _10 - 10 - 22_

**Wide Open Enterprises, LLC**

Douglas Rios, President

Date: _10 - 10 - 22_

**We Got Ammo, Inc.**

Douglas Rios, President

Date: _10 - 10 - 22_

**Blackstock, Inc.**

Anthony McKnight, CEO

Date: _10 - 10 - 22_

**Douglas Rios**

Date: _10 - 10 - 22_

**Anthony McKnight**

Date: _10 - 10 - 22_

**Sherrie McKnight**

Date: _10 / 10 / 22_

AGREED AS TO FORM:


_____ */s/ Michael J. Smith* _____          ___ */Glenn D. Bellamy/* _____
Michael J. Smith (Pro Hac Vice)               Glenn D. Bellamy (Pro Hac Vice)
THE FOWLER LAW FIRM, P.C.                      WOOD HERRON & EVANS LLP
8310 N. Capital of Texas Hwy.                  600 Vine Street, Suite 2800
Suite 150                                      Cincinnati, Ohio 45202
Austin, Texas 78731                            Email: gbellamy@whe-law.com
Email: msmith@thefowlerlawfirm.com             Tel: (513) 707-0243
Tel: (512) 441-1411

                                               *Attorneys for Plaintiffs*
*Attorney for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **RARE BREED TRIGGERS, LLC, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 22-CV-107-GKF-JFJ** |
| **THOMAS ALLEN GRAVES, et al.,** | ) | |
| **Defendants.** | ) | |

---

### Declaration of Tony McKnight

---

I, Tony McKnight, declare as follows:

1. I was a defendant in two patent litigations in Florida. *Rare Breed, et al. v. Big Daddy Enterprises, et al.*, 21-cv-001491 (N.D. Florida–Gainesville) and *Rare Breed, et al. v. Big Daddy Enterprises*, et al., 22-cv-00061 (N.D. Florida–Gainesville) (the "'061 Case").

2. In addition, I was the CEO of Big Daddy Enterprises, Inc., Big Daddy Unlimited, Inc. ("BDU"), and Blackstock, Inc., all of which were also named Defendants in one or both of the above recited cases.

3. In the '061 Case, Plaintiffs, Rare Breed Triggers, LLC and ABC IP, LLC, alleged that the Powered By Graves ALAMO-15 triggers infringed their '223 Patent (U.S. Pat. No. 10,514,223). Specifically, that BDU and Blackstock made, offered to sell, and did sell ALAMO-15 triggers.

4. On or about October 10, 2022, all parties in both of the Florida cases settled. As the terms of the settlement are confidential, I am not a liberty to disclose the terms. However, it was my intent and is my understanding that the terms of the settlement agreement covered the

Exhibit C

ALAMO-15 triggers made or sold by BDU and Blackstock which to my knowledge would have been all of them.

5. As part of licensing agreement between Thomas Graves and BDU, BDU owed Mr. Graves a duty of indemnity. Due to lack of finances, largely brought about by the two patent litigations, BDU was unable to honor its indemnification. One of my goals in executing the settlement agreement was to release Mr. Graves from any liability. It is my belief that I did so.

6. Lawrence Demonico, Cole Leluex, and their attorney, Glenn Bellamy were involved in the negotiation and execution of the settlement agreement and are all in possession of the above recited facts.

7. As such, I was surprised to learn that the Plaintiffs are attempting to extract further payment for the same triggers from Thomas Graves.

8. I have no objection to anyone sharing a copy of the settlement agreement with the Court in Oklahoma, Mr. Graves, or other Defendants in the Oklahoma case whose alleged infringement(s) pertains to the ALAMO-15 triggers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 20, 2024.

Respectfully submitted,

Tony McKnight